UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

OCT **9** 2007
OCT 9 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 06 CR 923-16 |
| vs. | ) | |
| | ) | Judge John W. Darrah |
| CRISTIAN BENTAN | ) | |

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and the defendant, CRISTIAN BENTAN, and his attorney, VICTOR CIARDELLI, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(C), as more fully set forth below in paragraph 16.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 06 CR 923-16.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities except as expressly set forth in this Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, CRISTIAN BENTAN, and his attorney, VICTOR CIARDELLI, have agreed upon the following:

1.    Defendant acknowledges that he has been charged in Counts Forty-Nine through Fifty-Two of the superseding indictment with wire fraud in violation of Title 18, United States Code, Section 1343, and in Counts Eighty-One and Eighty-Two with receipt of stolen property that had been transported interstate, in violation of Title 18, United States Code, Section 2315.

2.    Defendant has read the charges against him contained in the superseding indictment, and those charges have been fully explained to him by his attorney.

3.    Defendant fully understands the nature and elements of the crimes with which he has been charged.

4.    Defendant will enter a voluntary plea of guilty to Count Fifty-Two of the superseding indictment in this case.

5.    Defendant will plead guilty because he is in fact guilty of the charge contained in Count Fifty-Two of the superseding indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt and also constitute relevant conduct for purposes of Guideline § 1B1.3:

Beginning in approximately June 2004, and continuing to at least November 2006, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant devised and intended to devise and participated in a scheme to defraud

- 2 -

users of internet auction sites such as eBay, and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, as further described below.

Beginning in approximately June 2004, defendant BENTAN learned of an internet fraud scheme being run by individuals in Romania (the "Foreign Co-schemers") in which victims of the scheme were directed to send their money via Western Union to currency exchanges in the vicinity of Chicago. BENTAN became aware that the Foreign Co-schemers posed on-line as sellers of various items on internet auction sites, such as eBay, and convinced the victims to send the purchase money for items that the victims would never receive to individuals in Chicago working in concert with the Foreign Co-schemers.

In order to participate in the scheme, defendant BENTAN obtained and used a series of alias identification documents which falsely identified BENTAN as, for example, "Alberto Bagio," "Alberto Biagiolli," "Giuliano Biggato," "Paul Bigotti," "Roberto Fiorenza," "Luciano Pirogi," "Tony Pirolli," "John Raynolds," "Paul Silaghi," and "Alex Wagner." The alias names were used by the Foreign Co-schemers in their fraudulent internet solicitations in order to identify the individuals to whom the victims should send the purchase money for items fraudulently listed for sale, falsely describing "Paul Bigotti," for example, as a "seller" or "eBay agent."

- 3 -

Once the victims had agreed on-line to purchase an item and transmitted the funds via Western Union, the victims communicated to the Foreign Co-schemers information that enabled the co-schemers to receive the funds from a Western Union agent; this information generally con sisted of the victim's name, city of residence, dollar amount, and the money transfer control number (MTCN) assigned by Western Union to the victim's transaction. After the Foreign Co-schemers received this information, it was relayed to defendant BENTAN and other co-schemers.

In order to obtain the victims' funds, defendant BENTAN used alias identification documents to present himself to Western Union agents in the Chicago area (generally located at currency exchanges) as the intended receiver of the victims' wire transfers. With respect to Western Union, BENTAN signed "To Receive Money" forms completed which provided information that defendant had received from the Foreign Co-schemers regarding the transfer of funds, such as the sender's name, transfer amount, and MTCN. BENTAN then signed the "To Receive Money," falsely identifying himself on the "To Receive Money" forms in a manner consistent with the false identification documents that he presented to the Western Union agents.

Defendant BENTAN's participation in the scheme began in approximately June 2004 when he was introduced to the scheme by Individual 1. BENTAN

- 4 -

received fraud proceeds from Western Union agents using transactional data provided by the Foreign Co-schemers to Individual 1. Individual 1 then relayed the transactional data to defendant BENTAN, who then used the information to receive the fraud proceeds in the manner described above. BENTAN was paid approximately 5% of the proceeds and returned the balance to Individual 1. Individual 1 kept a percentage of the proceeds for himself and caused the balance to be transmitted to the Foreign Co-schemers. During these first few weeks of his involvement in the scheme, BENTAN received approximately $100,000 in funds wire transferred by victims of the scheme to Western Union.

Shortly after BENTAN began receiving fraud proceeds at the direction of Individual 1, Individual 2 learned of BENTAN's involvement in the scheme, and offered to pay BENTAN 10% of the fraud proceeds if BENTAN would pick-up transactions received by Individual 2 from the Foreign Co-schemers. BENTAN agreed to do so, and then began working in the scheme at the direction of Individual 2 for the next several months. As with Individual 1, after retaining his 10% of the fraud proceeds, BENTAN returned the balance to Individual 2, who kept a percentage of the fraud proceeds for himself. BENTAN and Individual 2 then caused the balance to be returned to the Foreign Co-schemers, generally via bank wire transfers to an account maintained by one of the Foreign Co-schemers.

While participating in the scheme, defendant BENTAN obtained false

- 5 -

identification documents for co-schemers who picked up Western Union transactions at the direction of co-schemer Individual 2, such as co-defendants Aslan and Bledea. Defendant BENTAN received passport-type photographs of co-schemers from Individual 2, or from the other co-schemers directly, and took them to a counterfeit document vendor known by BENTAN who operated in the vicinity of 26th Street and Kedzie Avenue in Chicago, Illinois. BENTAN charged $300 per counterfeit identification document, resulting in a profit of approximately $50 for BENTAN. BENTAN delivered the completed counterfeit identification document in some instances to Individual 2, and in some instances directly to the individual depicted on the counterfeit document, such as co-defendant Bledea or Aslan.

Defendant BENTAN was introduced to co-defendant Aslan through Individual 9, aka "Frank," who asked BENTAN to assist Aslan. Co-defendant Aslan advised BENTAN that he was aware of the Western Union scam and asked BENTAN to obtain false identification for Aslan so that Aslan could begin working in the scheme. BENTAN obtained a cellular telephone for Aslan with funds paid by Individual 2, and also obtained false identification documents for Aslan. Individual 2 would send text messages to BENTAN regarding Western Union transactions ready for pick-up, and BENTAN then forwarded those text messages to co-defendant Aslan. Aslan received fraud proceeds at the direction of Individual 2 and BENTAN for approximately 3 months during 2005. For approximately the first

- 6 -

couple of weeks, BENTAN drove Aslan to currency exchanges where Aslan received funds transmitted via Western Union by victims of the scheme, paying Aslan approximately 10% of the proceeds. Aslan then began driving himself to the currency exchanges, at which time Aslan was paid approximately 15% of the proceeds. Aslan returned the balance of the funds to BENTAN and Individual 2.

In the late summer of 2005, Individual 2 left the United States and asked defendant BENTAN to run the crew of individuals receiving fraud proceeds at Individual 2's direction. Individual 2 sent text messages with the necessary Western Union transactional data from Europe to defendant BENTAN, who then passed the information on to co-schemers in the Chicago area, such as Individual 4, Individual 5, and Individual 3, thereby enabling them to receive the funds from Western Union agents. After approximately three weeks, however, BENTAN learned from Individual 2 that Individual 3 had convinced Individual 2 to cut out BENTAN, and Individual 2 began to communicate the Western Union transactional data directly to Individual 3. BENTAN continued to participate in the scheme to defraud, in some instances obtaining fraud proceeds with transactional data provided by Individual 3, and in some instances through other sources.

In this manner, between approximately June 2004 and November 2006, defendant BENTAN received Western Union and bank wire transfers of fraud proceeds in amounts totaling approximately $262,000 from approximately 80

- 7 -

victims of the scheme to defraud. BENTAN retained a portion of the fraud proceeds for himself, in amounts which varied from 5% to 30% of the total, and caused the balance to provided to the Foreign Co-schemers and others, such as Individual 2.

Defendant BENTAN was aware that a number of additional individuals, such as co-defendants Igor Aslan, Mihai Bledea, Gabriel Constantin, Individual 1, Individual 2, Individual 3, Individual 4, Individual 5, Individual 6, Individual 7, Individual 8, were also using aliases and communicating with the Foreign Co-schemers in order to receive money derived from the scheme to defraud at various times during June 2004 through November 2006. BENTAN was aware that during the time period that he was participating in the scheme, co-schemers such as co-defendants Bledea, Aslan, Constantin, Individual 1, Individual 2, Individual 3, Individual 4, Individual 5, Individual 6, Individual 7, and Individual 8 and others also obtained fraud proceeds from dozens of additional victims in amounts well-exceeding an additional $800,000.

On or about January 23, 2006, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant BENTAN, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted in interstate commerce by wire communication from Georgia to Chicago, Illinois, certain writings, signs, signals, and sounds, namely a Western Union wire transmission of funds from Victim AK in the amount of approximately $2,970 that was received by BENTAN

posing as "Tony Pirolli" at the Foster Currency Exchange, in violation of Title 18, United States Code, Section 1343 and 2.

The foregoing recitation of facts represents only a summary of defendant BENTAN's knowledge of the charged conduct for purposes of providing a factual basis for his guilty plea. It does not contain every fact known to BENTAN about the events or individuals described herein or otherwise charged in the indictment.

6.     For purposes of calculating the guidelines promulgated on November 1, 2006, by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties agree on the following points:

(a)     The parties agree that the base offense level for the offense of conviction pursuant to Guideline § 2B1.1(a)(1) is seven.

(b)     The parties agree that because the amount of loss involved in the offense of conviction that was reasonably foreseeable to defendant was more than $1,000,000 but not more  than $2,500,000, a sixteen-level increase in the offense level is appropriate pursuant to Guideline § 2B1.1(b)(1)(I).

(c)     The parties agree that because the offense involved 250 or more victims, a six-level increase in the offense level is appropriate pursuant to Guideline § 2B1.1(b)(2)(C).

(d)     The parties agree that because a substantial part of the fraudulent scheme was committed from outside the United States, a two-level

- 9 -

increase in the offense level is appropriate pursuant to Guideline § 2B1.1(b)(9)(B).

(e)     Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if the defendant continues to accept responsibility for his actions, within the meaning of Guideline § 3El.1, a two-level reduction in the offense level is appropriate.

(f)     The defendant has assisted authorities in the prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate its resources efficiently, within the meaning of Guideline § 3E1.1(b); an additional one-point reduction in the offense level is therefore appropriate, provided the court determines the offense level to be sixteen or greater prior to the operation of Guideline § 3E1.1(a). The government will make such a motion pursuant to Guideline § 3E1.1(b) at the time of sentencing.

(g)     Based on facts currently known to the government, defendant has been the subject of one prior criminal sentence. On or about May 11, 2006, in Cook County, Illinois, defendant was sentenced to one year probation after pleading guilty to two counts of unlawful use of a drivers license in case no. 06C22066601.

- 10 -

Because the conduct for which this sentence was imposed was part of the instant offense, however, defendant accrues no criminal history points for this prior criminal sentence pursuant to Guideline § 4A1.2(a)(1). Accordingly, based on the facts known to the government, defendant's criminal history points equal 0 and defendant's criminal history is I.

(h) With an offense level of 28, the projected advisory Guideline range of imprisonment is 78 - 97 months.

(i) Defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Agreement. Defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations.

(j) Defendant understands that, in imposing the sentence, the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

7.      Errors in calculations or interpretation of any of the guidelines may be

corrected by either party prior to sentencing. The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation office and/or Court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected by such corrections, and the defendant shall not have a right to withdraw his plea on the basis of such corrections.

8.      Defendant understands that the count to which he will plead guilty carries a maximum penalty of 20 years imprisonment; a maximum fine of $250,000, twice the gain derived by the defendant from his offense or twice the loss caused by his offense, whichever is greater; as well as any restitution ordered by the Court. Defendant further understands that the offense also carries a term of supervised release of not more than three years, which the Court may specify.

9.      The defendant understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, the defendant will be assessed $100 on the offense to which he has pled guilty, in addition to any other penalty imposed. The defendant agrees to pay the special assessment of $100 at the time of sentencing with cash or a money order made payable to the Clerk of the U. S. District Court.

10.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

- 12 -

(a)  If defendant persisted in a plea of not guilty to the charge against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

(b)  If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of defendant's guilt beyond a reasonable doubt and that it was to consider each count of the superseding indictment separately.

(c)  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

(d)   At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

(e)   At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

11.   Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights. Defendant further understands that he is waiving all appellate issues that might have been available if he had exercised his right to trial.

12.   Defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal a sentence. In exchange for the concessions made by the government in this plea agreement, defendant knowingly waives the right to appeal any sentence within the maximum provided in the statute of

conviction, or the manner in which that sentence was determined. The defendant also waives his right to challenge the sentence in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel which relates directly to this waiver or its negotiation.

13. Defendant understands that the superseding indictment and this Plea Agreement are matters of public record and may be disclosed to any party.

14. Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

15. Defendant agrees he will fully and truthfully cooperate with the government in any matter in which he is called upon to cooperate.

(a) Defendant agrees to provide complete and truthful information in any investigation and pre-trial preparation, and complete and truthful testimony, if called upon to testify by a representative of the United States Attorney, before any federal or state grand jury, any United States District Court or state court proceeding, and any related civil administrative or court proceeding. In addition,

defendant agrees to cooperate fully in preparation for any testimony.

(b) Defendant agrees to postpone his sentencing until after the conclusion of the prosecution of his co-defendants.

16. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation and, assuming the defendant's full and truthful cooperation, shall move the Court, pursuant to Sentencing Guideline 5K1.1, to depart from the applicable guidelines range, and to impose the specific sentence agreed to by the parties as outlined below. Defendant understands that the decision to depart from the applicable guideline range rests solely with the Court. However, this Plea Agreement is governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons that is two-thirds of the low-end of the applicable guidelines range. Other than the agreed term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes the agreed term of incarceration set forth, the defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(d). If, however, the Court refuses to impose the agreed sentence of incarceration, thereby rejecting the Plea Agreement, or otherwise refuses to accept the defendant's plea of guilty, this Plea Agreement shall become

null and void and neither party will be bound thereto.

17.     Regarding restitution, defendant agrees that the offense to which he is pleading guilty is an offense against property, and thus an order of restitution is required pursuant to Title 18, United States Code, Section 3663A. The defendant further agrees to the entry of an order of restitution in an amount to be determined at the time of sentencing. The defendant understands that Title 18, United States Code, Section 3664 and Sections 5E1.1 and 5E1.2 of the Sentencing Guidelines set forth the factors to be weighed in setting a fine and in determining the schedule, if any, according to which restitution is to be paid in this case. The defendant agrees to provide full and truthful information to the Court and United States Probation Officer regarding all details of his offense-related conduct and his economic circumstances in order to determine the amount of restitution owed and the proper restitution schedule according to which the defendant may be ordered to pay. Defendant understands that this disclosure requires that he disclose all assets, including cash, real estate and other property. Defendant understands that providing false or incomplete information may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the Court.

18.     Defendant understands that his compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement.

- 17 -

He further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute the defendant not subject to any of the limits set forth in this Agreement, or to resentence the defendant. The defendant understands and agrees that in the event that this Plea Agreement is breached by the defendant, and the Government elects to void the Plea Agreement and prosecute the defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this agreement and the commencement of such prosecutions.

19.     After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the superseding indictment as to defendant.

20.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

21.     Defendant agrees this Plea Agreement shall be filed and become a part of the record in this case.

22.     Should the judge refuse to accept the defendant's plea of guilty, this

- 18 -

Agreement shall become null and void and neither party will be bound thereto.

23.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _____10 - 9 - 07_____

_____
PATRICK J. FITZGERALD
United States Attorney

_____
CRISTIAN BENTAN
Defendant

_____
BRIAN HAYES
Assistant U.S. Attorney

_____
VICTOR CIARDELLI
Attorney for Defendant

- 19 -